# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SLINGER MANUFACTURING COMPANY, Inc.,

          Plaintiff,

                                        **Case No. 08-C-656**

      -vs-

NEMAK, S.A., a Mexican sociedad anonima,
NEMAK OF CANADA CORPORATION,
a Canada corporation,
NEMAK ALUMINO DE MEXICO, S.A. DE C.V.,
a Mexican anonima de capital variable, and
HENAN ZHONGYUAN ENGINE FITTINGS
STOCK CO., Ltd. a Chinese corporation,

          Defendants.

# DECISION AND ORDER

The plaintiff, Slinger Manufacturing Company, Inc ("Slinger"), is what is known as a Tier 2 supplier of automotive parts. Slinger is engaged in the business of, among other things, supplying automotive engine cylinder liners (the "Parts") to certain Original Equipment Manufacturers ("OEMs") (*e.g.*, General Motors Corporation, Ford Motor Company, Chrysler LLC) and to higher-tiered suppliers. Slinger is a Wisconsin corporation with its principal place of business in Slinger, Wisconsin.

Defendants Nemak, S.A., Nemak of Canada Corporation, and Nemak Alumino de Mexico ("Nemak") are collectively a Tier 1 supplier of automotive parts. Nemak manufactures and supplies aluminum engine blocks to the OEMs.

Defendant Henan Zhongyuan Engine Fittings Stock Co., Ltd. ("ZYNP") is a Tier 3 supplier in the automotive industry, and is (or was) engaged in the business of manufacturing and supplying the Parts to Slinger. ZYNP is a Chinese corporation with its principal place of business in Mangzhou City, Henan Province, People's Republic of China.

The above-captioned lawsuit relates to alleged collective action by Nemak and ZYNP to circumvent Slinger's contractual relationship with ZYNP, whereby Nemak will buy the Parts directly from ZYNP instead of Slinger, effectively forcing Slinger out of business. On August 1, 2008, Slinger brought this action and a request for a Temporary Restraining Order. On the same day, the Court denied the TRO and *sua sponte* converted the motion into a request for a preliminary injunction.

On August 5, 2008, the Court held a telephonic hearing on Slinger's request for injunctive relief. Following the hearing, the Court entered a briefing schedule relative to any jurisdictional issues the parties considered relevant to this action. The Court also set this matter for a trial on Slinger's injunction request for December 1, 2008.

Since the hearing, a variety of motions were filed, and the briefing schedule concluded. Slinger also filed an amended complaint. For the reasons that follow, this matter will be stayed pending arbitration.

## BACKGROUND[1]

The Parts which Slinger supplies are designed and manufactured to meet the stringent quality and safety standards of its customers. The Parts are initially manufactured for Slinger

---

[1] The following factual background is taken largely from Slinger's First Amended Complaint. (D. 18).

-2-

by ZYNP. Slinger employees located at ZYNP's facilities in China oversee the technical requirements related to the manufacturing process in China. The Parts are then shipped to Slinger where they are inspected, quality tested, and finished. Finally, Slinger supplies the Parts to Nemak, where they are incorporated into aluminum engine blocks. Some of the Parts are manufactured using a proprietary manufacturing process developed by Slinger, known as "Slingerbond."

Slinger and ZYNP are parties to a fixed price, requirements contract whereby ZYNP is obligated to supply Slinger with 100% of Slinger's requirements of the Parts through the end of the term. The Contract requires ZYNP to refrain from interfering with Slinger's relationships with its customers. Article 3, paragraph c states: "The Supplier [ZYNP] hereby agrees: To refrain from doing anything that, in the reasonable judgment of the Distributor [Slinger], would or might prevent sales of the Products or interfere with such sales to the Distributor's customers." The Contract further addresses exclusivity (Article 7, paragraph a); contains a covenant not to compete (Article 7, paragraph a); provides for liquidated damages (Amendments, Article 1, amending Article 7, paragraph b); and contains a clause for arbitration (Article 16).

By a letter dated July 25, 2008, ZYNP advised Slinger that it would no longer do business with Slinger and that it would not be shipping any more parts. The Letter also purported to terminate the Contract. Just one hour after receiving ZYNP's purported termination letter, Slinger also received a letter from Nemak dated July 25, 2008 requesting "further assurances" that Slinger would comply with its obligation to ship Parts to Nemak.

-3-

Slinger responded to Nemak's July 25, 2008 letter on July 26, 2008. Slinger's response advised Nemak that it would continue to ship the Parts. Slinger further advised Nemak of ZYNP's attempt to terminate the Contract and shared a copy of the letter they received from ZYNP with Nemak. On July 28, 2008, Nemak responded to Slinger's request, but failed to provide any assurances that it was acting in good faith.

Since the date of ZYNP's purported Termination Letter, Slinger has been seeking to negotiate an end to ZYNP's breach of contract. Slinger requested a meeting with ZYNP to discuss the current dispute. However, ZYNP refuses to meet with Slinger unless Slinger abandons the Contract with ZYNP, abandons its contracts with Nemak, permits ZYNP to sign an agreement as a direct supplier of Nemak, and agrees to work as a logistic and technical support service for ZYNP.

ZYNP is the only Company in the world that manufactures the Parts. Therefore, Slinger alleges that Nemak and ZYNP are working in concert to create a perceived threat to Nemak's supply chain, allowing them to fabricate a situation where Nemak is forced to purchase Parts directly from ZYNP.

On August 5, 2008, Slinger sent ZYNP revised purchase orders, which included a price increase of $0.35 per liner, as previously agreed to by ZYNP. Slinger's employees attempted to hand deliver the revised purchase orders to Zhao Fei at ZYNP. The revised purchase orders were also sent to Fei via e-mail. ZYNP refused to accept the revised purchase orders, and denied receiving the e-mailed versions.

-4-

In its amended complaint, Slinger alleges the following claims for relief: (1) violation of the Wisconsin Fair Dealership Law (ZYNP); (2) injunctive relief and specific performance (ZYNP); (3) injunctive relief and tortious interference (Nemak); (4) tortious interference (ZYNP); (5) declaratory relief and specific performance (ZYNP); (6) breach of contract (ZYNP); and (7) breach of covenant of good faith and fair dealing (Nemak). Slinger requests an injunction requiring ZYNP to continue to supply the Parts to Slinger, an injunction prohibiting Nemak from purchasing the Parts from ZYNP, as well as related equitable relief and monetary damages.

## ANALYSIS

### I. Arbitration

Both Slinger and Nemak move to either stay this action or to dismiss in favor of arbitration. As noted above, the Contract between Slinger and ZYNP contains an arbitration clause. Slinger also entered into contracts with the various Nemak entities which include arbitration clauses.

The Federal Arbitration Act ("FAA") (9 U.S.C. §§ 1-16) creates a body of federal law governing arbitrability of claims potentially subject to an arbitration agreement. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983). To fall under the FAA, an agreement to arbitrate must be written, and it must evidence "a transaction involving commerce." 9 U.S.C. § 2.

As a matter of federal law, doubts concerning the scope of an arbitration provision are resolved in favor of arbitration. *Moses H. Cone* at 24-25. In determining the scope of the

Case 2:08-cv-00656-RTR   Filed 09/24/08   Page 5 of 21   Document 60

arbitration provision, ordinary state law contract principles are applied.  *See Hill's Pet Nutrition, Inc. v. FruCon Construction Corp.*, 101 F.3d 63, 65-66 (7th Cir. 1996).  The "policy basis of [the FAA] is particularly strong in the context of international transactions." *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1514 (10th Cir. 1995).

Under the FAA, if one party to a contract containing an arbitration clause attempts to avoid arbitration and files suit in the district court, the other party may move to stay or dismiss the action on the ground that the FAA requires the arbitration clause to be enforced. 9 U.S.C. § 3.  If the Court identifies an arbitrable issue, it must issue a stay or dismiss under § 3.  *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).

### A.    Claims against ZYNP

The English version of the Contract between Slinger and ZYNP provides for the arbitration of any "disputes, controversies or claims arising from this Agreement" to take place in "Singapore in accordance with the then prevailing Rules of the International Arbitration."  Article 16.  The Chinese version of this clause is slightly different, as it provides that "arbitration shall be conducted at the Singapore International Arbitration Institution."  (Docket No. 54, Declaration of Paul H. Zhang, Exhibit B, Paragraph 10). Article 17(a) of the Contract provides that it is "written in both English and Chinese languages.  Both versions shall be equally authentic."

As an initial matter, the parties are in apparent agreement that Slinger's breach of contract claim is an arbitrable claim, as it clearly "arises from" the Contract itself.  Slinger's breach of contract claim encompasses its request for injunctive relief, declaratory relief, and

specific performance under and pursuant to the Contract at issue. Slinger's WFDL claim[2] is also subject to arbitration. *See Good(E) Bus. Sys., Inc. v. Raytheon Co.*, 614 F. Supp. 428, 430-31 (W.D. Wis. 1985) (distribution agreement which provided for arbitration of disputes "arising in connection with" the agreement broad enough to cover dealership claim).

Less clear is whether Slinger's claim for tortious interference is an arbitrable claim. Slinger alleges that ZYNP "wrongfully and intentionally interfered with these relationships [with Nemak] by attempting to or arranging to sell the parts to Nemak, *in violation of the contract between ZYNP and Slinger*." (Amended Complaint, ¶ 89). This allegation at least suggests that the tortious interference claim in some way "arises from" the Contract between ZYNP and Slinger. Given that doubts should be resolved in favor of arbitration, the Court concludes that this is also an arbitrable claim. *See Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002) (standard arbitration clause using phrase "arising out of" or "relating to" the contract is "admittedly expansive," encompassing "all manner of claims tangentially related to the agreement, including claims of fraud, misrepresentation, and other torts").

More generally, Slinger argues that the arbitration clause itself is unenforceable under Chinese law. "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.

---

[2] The Court expresses no opinion at this time as to the merits of Slinger's dealership claim.

According to Slinger, Section 18 of the Arbitration Law of the People's Republic of China ("PRC") states: "[i]f an arbitration agreement contains no or unclear provisions concerning the matters for arbitration or the arbitration commission, the parties may reach a supplementary agreement. If no such supplementary agreement can be reached, the arbitration agreement shall be null and void." (Docket No. 52, Exhibit B). Under the "Interpretation of the Supreme People's Court," arbitration clauses that contain ambiguous references to arbitration institutions are unenforceable. (Docket No. 52, Exhibit D, Art. 6). Therefore, Slinger argues that the arbitration clause is unenforceable because it does not refer to a particular arbitration commission or panel.

Slinger's argument ignores the Chinese language version of its Agreement with ZYNP. As noted above, the Chinese version refers to the Singapore International Arbitration Institution. There is a well-known arbitration organization known as the Singapore International Arbitration Centre ("SIAC"). (Docket No. 54, Exhibit C). General PRC contract law allows a contract to be conducted in multiple languages, and when "it is agreed that all versions are equally authentic, the words and sentences in each version are construed to have the same meaning. In case of any discrepancy in the words or sentences used in the different language versions, they shall be interpreted in the light of the purpose of the contract." (Docket No. 54, Exhibit B, ¶ 12).

In this context, the purpose of the contract is clearly in favor of arbitration. Moreover, while the Chinese version of the Agreement uses the term "Institution" instead of "Centre,"

the reference to SIAC is not ambiguous.[3]   Under Chinese law, the arbitration clause is

enforceable.  *See, e.g., Apple & Eve, LLC v. Yantai North Andre Juice Co Ltd.*, 499 F. Supp.

2d 245, 248-253 (E.D.N.Y. 2007) (granting motion to compel arbitration in China, even

though the arbitration agreement failed to designate a specific arbitration commission as

required by Chinese law).

### B.      Claims against Nemak

Slinger's contract with Nemak S.A. provides that any "dispute, controversy or claim

arising out of, or in relation to, or in connection with the Agreement" shall be "resolved in

accordance with the Rules of Conciliation and Arbitration of the International Chamber of

Commerce."  Slinger's contract with Nemak of Canada provides that "[a]ll matters in dispute

under this agreement shall be referred to the arbitration of a single arbitrator..."[4]

Slinger's claims against Nemak are tort claims: Count III (tortious interference), and

Count VII (breach of covenant of good faith and fair dealing).  Slinger argues that these are

not arbitrable claims because they have nothing to do with Slinger's contracts with Nemak

– in other words, they do not "arise out of" or fall "under" those agreements.  However, the

language in the Nemak S.A. contract encompasses claims "arising out of, *or in relation to,*

*or in connection with the Agreement*."  The language "in relation to" is particularly broad,

and courts have noted that such language has a broader reach than the phrase "arising out of."

---

[3]  The words used in the Chinese language for "center" and "institution" are often used interchangeably.  (D. 54, Ex. B, ¶ 13).

[4]  Slinger claims that it never entered into a contract with the third Nemak entity, Nemak Alumino, but that its contract is with Nemak Alumino's predecessor in interest, Teksid Alumino de Mexico, S.A.  The Court need not resolve this dispute at this time, as it is not germane to the Court's analysis and ultimate conclusion.

-9-

*See Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999) (phrase "'arising out of or relating to' . . . characterized as extremely broad and capable of an expansive reach").

Focusing on the phrase "relating to," it is clear that Slinger's tort claims against Nemak (at least those against Nemak S.A.) are in some way related to Slinger's contractual relationship with Nemak. For example, Slinger alleges that Nemak "wrongfully and intentionally interfered with [Slinger's relationship with ZYNP] by attempting to or agreeing to purchase Parts directly from ZYNP." (Amended Complaint, ¶ 81). By purchasing parts directly from ZYNP, there is at least the implication that such action is wrongful under the contractual relationships between Slinger and Nemak. Given the traditional presumption in favor of arbitration, and the particularly broad language in the Nemak S.A. agreement, the Court concludes that Slinger's tort claims against Nemak are arbitrable claims. *See, e.g., Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Intern., Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993) (party may not avoid a contractual arbitration clause merely by "casting its complaint in tort").

### C.    Issuance of stay

As demonstrated by the foregoing discussion, at a minimum this action presents a mix of arbitrable and non-arbitrable claims. While there are decent arguments to be made against the arbitrability of the various tort claims against both ZYNP and Nemak, there is no doubt that Slinger's contract claim against ZYNP must be submitted to arbitration.

-10-

When the Court is confronted with a mix of arbitrable and non-arbitrable issues, "the FAA does not give courts express guidance on how to proceed." *Volkswagen of America, Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007). In this instance, courts have discretion to stay non-arbitrable claims pending the outcome of an arbitration proceeding. *See id.* (quoting *McCarthy v. Azure*, 22 F.3d 351, 361 n.15 (1st Cir. 1994)). Arbitration is very likely to resolve issues material to this lawsuit, or at least shed light on any issues that may, as it turns out, be considered non-arbitrable. *See id.* at 972.

Therefore, instead of dismissing this action in its entirety, the Court will enter a stay accompanied by an order to engage in arbitration. *See, e.g., State of Wisconsin v. Ho-Chunk Nation*, 564 F. Supp. 2d 856, 863 (W.D. Wis. 2008) ("Although it may be overly optimistic to predict that arbitration will dispose of all issues . . . that possibility suggests the proper procedural course is to close the case administratively, subject to immediate reopening if all issues are not resolved in arbitration").

## II.   Injunctive relief

Despite the fact that this matter must be stayed pending arbitration, Slinger presses its request for injunctive relief. In the Seventh Circuit, preliminary injunction proceedings may go forward, even while all other judicial proceedings have been stayed pending arbitration, in order to preserve the status quo and prevent irreparable harm. *See IDS Life Ins. Co. v. Sun America, Inc.*, 103 F.3d 524, 527 (7th Cir. 1996). Injunctive relief may be granted "in order to prevent arbitration from being rendered futile by the conduct of the other party, the injunction to last just long enough to allow a request for injunctive relief to be

-11-

referred to the arbitral tribunal." *Id.* (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993)).

However, for the reasons set forth in the next section, the Court lacks jurisdiction over Slinger's breach of contract claim against ZYNP. Therefore, the Court will not allow the injunction proceedings to go forward because it lacks jurisdiction to enter the injunction sought by Slinger. Without jurisdiction to order specific performance under the Slinger-ZYNP contract, the Court is unable to issue an order maintaining the status quo pending arbitration.

## III. Personal jurisdiction[5]

For a court to exercise personal jurisdiction against a particular defendant, federal due process requires defendants to have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The concept of minimum contacts protects such a defendant from having to litigate in a distant forum and allows the defendant to reasonably anticipate where he may be haled into court. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980). "[T]here must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

---

[5] The following analysis is restricted to ZYNP's contacts with Wisconsin. Nemak reserved the right to contest personal jurisdiction but did not move to dismiss on those grounds.

-12-

## A.    General jurisdiction

General jurisdiction is appropriate only where a defendant maintains "continuous and systematic general business contacts" with a particular forum. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). General jurisdiction is for suits neither arising out of nor related to the defendant's contacts. *Id.* These contacts must be so extensive as to make it "fundamentally fair to require [ZYNP] to answer in any [Wisconsin] court in *any* litigation arising out of *any* transaction or occurrence taking place *anywhere* in the world." *Purdue Research Foundation v. Sanofi-Synthelabo S.A.*, 338 F.3d 773, 787 (7th Cir. 2003) (emphases in original). The standard for establishing general jurisdiction is difficult to satisfy. *See Truck and Engine Corp. v. Dawson*, 216 F. Supp. 2d 754, 759 (N.D. Ind. 2002).

To determine whether general jurisdiction may be exercised over a defendant, courts consider the following factors:

> (1) whether and to what extent the defendant conducts business in the forum state; (2) whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an agent for service of process in the forum state.

*See Central States, Southeast and Southwest Areas Pension Fund v. Phencorp Reinsurance Co., Inc.*, 530 F. Supp. 2d 1008, 1015-16 (N.D. Ill. 2008) (citing *Helicopteros*, 466 U.S. at 416).

-13-

ZYNP's contacts with Wisconsin are as follows: (1) maintenance of an ongoing business relationship with Slinger for the term of the Agreement (which began in July of 2000); (2) weekly, if not daily, correspondence with Slinger in Wisconsin by fax, email, or telephone during that entire eight year period, relating to performance under the Agreement and future market development; (3) a four-day business trip to Wisconsin in June 2005 to visit Slinger representatives and tour the Slinger facility; (4) an ongoing business relationship with Mercury Marine Company in Fond du Lac, Wisconsin, which predated the Slinger-ZYNP relationship and which is contemplated by the Slinger-ZYNP Agreement; and (5) many of the Parts supplied by ZYNP are and were sold by Slinger to manufacturers doing business in Wisconsin.

On the other hand, ZYNP is a Chinese corporation that maintains no offices or employees in Wisconsin. ZYNP does not have a designated agent for service of process in Wisconsin. The Agreement between Slinger and ZYNP was formed by the parties in China. ZYNP performed its obligations under the Agreement in China and dealt with Slinger in China, as Slinger has five employees permanently located in China. Under these circumstances, it cannot be said that ZYNP is "constructively present" in Wisconsin. *Purdue*, 338 F.3d at 787. Maintenance of a business relationship with a Wisconsin corporation through regular correspondence, combined with a single business visit to Wisconsin, are not "continuous and systematic general business contacts" such that the Court may exercise general personal jurisdiction over ZYNP. *See, e.g., Noonan v. Winston Co.*, 135 F.3d 85, 92-93 (1st Cir. 1998) (non-resident company's regular and frequent telephone

-14-

calls, faxes and letters to resident company to solicit business insufficient to establish general jurisdiction); *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1045-46 (2d Cir. 1991) (thirteen business trips of short duration over the course of eighteen months did not constitute "continuous and systematic" solicitation of business in the state of New York).[6]

### B. Specific jurisdiction

Having determined that ZYNP is not subject to general personal jurisdiction in Wisconsin, the Court must determine whether it may exercise specific jurisdiction over each of Slinger's claims against ZYNP. To assert specific jurisdiction, the causal connection between the litigation and the defendants' contacts with the forum state must be close enough to comport with fair play and substantial justice. *See RAR, Inc.*, 107 F.3d at 1278. ZYNP's contacts with Wisconsin are not merely aggregated to determine evidence of the constitutionally-required minimum contacts. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 716 (7th Cir. 2002). Rather, the action "must *directly arise* out of the specific contacts between the defendant and the forum state." *RAR, Inc.* at 1278 (emphasis in original). In a contract case, nothing is relevant to the minimum contacts analysis except "the dealings between the parties in regard to the disputed contract." *Id.* at 1278; *Hyatt Int'l Corp.*, 302 F.3d at 717.

---

[6] *See also L.H. Carbide Corp. v. Piece Maker Co.*, 852 F. Supp. 1425, 1433-34 (N.D. Ind. 1994) (contacts did not satisfy standard for general jurisdiction despite sales to Indiana customers amounting to 8% of total annual sales, along with one employee's visits to Indiana every two to three months and his calls to Indiana customers); *Glass v. Kemper Corp.*, 930 F. Supp. 332, 338 (N.D. Ill. 1996) (no general jurisdiction where defendant managing director's contacts with Illinois included one interview with defendant corporation; attendance at board meetings held in Illinois several times per year for one or two days at a time; occasional telephone calls and letters written to Illinois; and holding of bank account in Illinois).

Here, the dealings between ZYNP and Slinger with respect to the contract demonstrate that ZYNP did not purposefully avail itself of the benefits and protections of Wisconsin law. As noted, ZYNP and Slinger formed the contract in China. While ZYNP corresponded with Slinger in Wisconsin during the course of performance, and even visited Slinger in Wisconsin during that timeframe, ZYNP also dealt directly with Slinger's representatives in China. Moreover, ZYNP and Slinger negotiated a clause at arms-length which requires the resolution of contractual disputes in an arbitration forum in Singapore. In this respect, it cannot be said that ZYNP would reasonably anticipate being haled into a Wisconsin court on a claim for breach of contract. *See CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 366-67 (2d Cir. 1986) (arbitration and choice of law provisions "should not be ignored when making jurisdictional determinations. . . . [They are] relevant in determining whether a defendant purposefully availed himself of the forum's laws under constitutional jurisdictional restraints") (citing *Burger King*, 471 U.S. at 481-82); *Airtel Wireless, LLC v. Montana Electronics Co., Inc.*, 393 F. Supp. 2d 777, 784 (D. Minn. 2005) (choice of law clause "is a heavily weighed factor in deciding whether [a party] purposefully invoked the benefits and protections of" the forum's laws).

Slinger relies on *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353 (7th Cir. 1996). In *Mid-America Tablewares*, the court found that a Wisconsin court could exercise jurisdiction over a Japanese corporation. The Japanese corporation engaged in initial discussions with an Eau Claire, Wisconsin corporation via mail and fax in connection with the sale of dinnerware. Representatives from Japan also visited Eau Claire

-16-

to engage in "preliminary discussions over a three-day period." *Id.* at 1361. After placing a purchase order, the Wisconsin corporation later discovered that the dinnerware exceeded FDA guidelines for leachable lead.

*Mid-America Tablewares* is distinguishable from the case at bar. Most notably, ZYNP did not visit Wisconsin or correspond with Slinger in Wisconsin in the process of contract *formation*, as was the case in *Mid-America Tablewares. See Id.* at 1361 (noting that the defendant's "'participation in substantial negotiations conducted *in the forum state leading to the contract at issue* is a significant basis for personal jurisdiction'") (emphasis added) (quoting *Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 581 (7th Cir. 1994)). Further, the plaintiff in *Mid-America Tablewares* did not maintain a physical presence in the defendant's home forum. In the instant case, Slinger maintained offices and employees in China to assist ZYNP in the course of its performance under the contract at issue. Finally, the parties in *Mid-America Tablewares* did not enter into a clause requiring arbitration of disputes before a foreign arbitration panel.[7]

As for the tort claims, it is more reasonable to conclude that ZYNP (and Nemak) could be haled into Wisconsin court under what is referred to as the "effects doctrine," which is liberally construed in the Seventh Circuit. *See, e.g., Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997) (applying effects doctrine to tortious interference with prospective economic advantage claim and holding "the state in which the injury (and therefore the tort)

---

[7] The Seventh Circuit did not discuss the distinction between general and specific jurisdiction. It seems as if the court imposed specific jurisdiction in relation to the plaintiffs' claim for breach of warranty.

-17-

occurs may require the wrongdoer to answer for its deeds even if events were put into train outside its borders").

Assuming, without deciding, that the effects doctrine would ensnare Slinger's tort claims against ZYNP and Nemak, the Court still may not proceed to the merits of Slinger's request for injunctive relief. The only way to maintain the status quo in the instant case is to order specific performance under Slinger's contract with ZYNP. That is how the supply chain from ZYNP (tier 3) to Slinger (tier 2) to Nemak (tier 1) will be restored. Even though Slinger alleges irreparable harm with respect to its various tort claims, the exercise of jurisdiction over those claims would not authorize the Court to restore the supply chain. An order enjoining Nemak from buying the Parts directly from ZYNP (or an order requiring that Nemak purchase the Parts directly from Slinger) would not maintain the status quo unless ZYNP was also forced to continue supplying Parts to Slinger.[8]

### C. Pendent personal jurisdiction

Even though the Court may have jurisdiction over ZYNP and Nemak with respect to Slinger's tort claims, the Court will not exercise "pendent personal jurisdiction" over Slinger's breach of contract claim against ZYNP. "Under the doctrine of pendent personal jurisdiction, a court may exercise its discretion to hear claims as to which personal jurisdiction may otherwise be lacking if those claims arise out of a common nucleus of facts

---

[8] For example, Slinger requests an order "prohibiting Nemak from purchasing the Parts directly or indirectly from ZYNP . . . *unless those parts are supplied by Slinger*." (Amended Complaint, Relief Requested, ¶¶ c, d) (emphasis added). This request clearly contemplates Slinger's re-insertion into the supply chain. Unless ZYNP is ordered to continue supplying the Parts to Slinger, Slinger's entire basis for injunctive relief collapses.

-18-

with claims as to which personal jurisdiction exists." *Banwell v. Illinois College of Optometry*, 981 F. Supp. 1137, 1141 n.4 (N.D. Ill. 1997).

The doctrine of pendent personal jurisdiction "is a confusing and complicated one which courts sometimes overlook." *Beveridge v. Mid-West Management, Inc.*, 78 F. Supp. 2d 739, 745 n.3 (N.D. Ill. 1999). As noted by a leading commentator, in the diversity of citizenship context, a "pendent personal jurisdiction policy in a state whose long-arm statute extends to the fullest permissible limits . . . would either be redundant or unconstitutional." WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE 3D § 1069.7. It would be redundant if it "only captured claims that might have been captured by the state's long-arm statute." *Id.* It would be unconstitutional if it captured claims that "fall outside of the Fourteenth Amendment's due process limits on the state's long-arm statute." *Id.* Wisconsin's long-arm statute reaches to the full extent allowed by due process, *see Pebble Beach Co. v. Northern Bay LLC*, 405 F. Supp. 2d 1019, 1023 (W.D. Wis. 2005), and the Court already determined that the exercise of jurisdiction over the contract claim violates due process. Therefore, pendent personal jurisdiction should not be applied because all of the claims are grounded in diversity jurisdiction. *See, e.g., Bowers v. NETI Technologies, Inc.*, 690 F. Supp. 349, 357 (E.D. Pa. 1988); *Stelax Industries, Ltd. v. Donahue*, No. 3:03-CV-923-M, 2004 WL 733844 at *9 (N.D. Tex.).[9]

---

[9] The doctrine is more typically and appropriately invoked in cases where "one or more *federal claims* for which there is *nationwide personal jurisdiction* are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction." *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180-81 (9th Cir. 2004) (emphases added).

Even if the Court could exercise pendent personal jurisdiction over Slinger's breach of contract claim against ZYNP without running afoul of due process, the Court would decline to do so. In its discretion, the Court may decline to address pendent claims "where considerations of judicial economy, convenience and fairness to litigants so dictate." *Oetiker v. Werke*, 556 F.2d 1, 5 (D.C. Cir. 1977). It would be unfair to require litigation in Wisconsin when the contracting parties contemplated litigation before an arbitration panel in a foreign country.

## IV.    Conclusion

Many, if not all, of the claims in this matter are arbitrable claims. The Court also lacks jurisdiction over Slinger's claim for specific performance and injunctive relief pursuant to its contract with ZYNP.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.      This matter is **STAYED** pending arbitration of the claims alleged in Slinger's First Amended Complaint.  The parties must proceed to arbitration as required by the pertinent contractual relationships;

2.      The trial, previously set for the week of December 1, 2008, is **CANCELLED**;

3.      All pending motions are termed and/or **DENIED** as moot [D. 11, 16, 32, 37, 40]; and

4.      This matter is **CLOSED** for administrative purposes.

Dated at Milwaukee, Wisconsin, this 24th day of September, 2008.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**Chief Judge**
